UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

ANGELA MARIE CHRISTY,

                Plaintiff,

      v.

CAROLYN W. COLVIN, Acting
Commissioner of the Social Security
Administration,

              Defendant.

CASE NO. 14-cv-05362 JRC

ORDER ON PLAINTIFF'S
COMPLAINT

      This Court has jurisdiction pursuant to 28 U.S.C. § 636(c), Fed. R. Civ. P. 73 and Local Magistrate Judge Rule MJR 13 (*see also* Notice of Initial Assignment to a U.S. Magistrate Judge and Consent Form, ECF No. 3; Consent to Proceed Before a United States Magistrate Judge, ECF No. 4). This matter has been fully briefed (*see* ECF Nos. 12, 16, 17).

      After considering and reviewing the record, the Court concludes that the ALJ provided clear and convincing reasons for failing to credit fully plaintiff's allegations and

testimony, including her non-compliance with medical treatment, but her improvement when compliant; lack of motivation to work; and inconsistent statements. The ALJ also provided specific and legitimate rationale for his failure to credit fully all of the medical opinions, noting for example, that plaintiff's objective test results indicated that plaintiff was over-reporting unlikely symptoms, that one doctor strongly suspected malingering and another doctor opined that plaintiff's profile was "definitely exaggerated." Because the doctors relied on plaintiff's unreliable self-reporting when providing their opinions, the ALJ properly declined to credit fully all of their opinions.

Therefore, this matter is affirmed pursuant to sentence four of 42 U.S.C. § 405(g).

<u>BACKGROUND</u>

Plaintiff, ANGELA MARIE CHRISTY, was born in 1979 and was 28 years old on the alleged date of disability onset of January 1, 2008 (*see* Tr. 123-25). However, because plaintiff has applied only for supplemental security income, which is not payable prior to the month following the month in which the application was filed and plaintiff filed her application on January 29, 2009, the ALJ's written decision includes findings and conclusions regarding plaintiff's condition since January 29, 2009, although the ALJ indicates that he considered the complete medical history (*see* Tr. 623, 625).

Plaintiff left school after the 8th grade (Tr. 27).  Plaintiff has worked as a dishwasher, as a hostess in a restaurant, as a customer service/video, and on an assembly line (Tr. 213-17). At her first administrative hearing in December, 2010, plaintiff could not remember the last time that she had held a job (*see* Tr. 50).

1    According to the ALJ, at the time of latest hearing on December 6, 2013, plaintiff

2  had at least the severe impairments of "degenerative joint disease in the knees;

3  gastroesophageal reflux disease; diabetes; fibromyalgia; obesity; carpal tunnel syndrome;

4  depression; bipolar disorder; panic disorder without agoraphobia; cognitive disorder;

5  personality disorder; and drug abuse (20 CFR 416.920(c))" (Tr. 625).

6    At the time of the hearing, plaintiff was separated from her husband and living in

7  an apartment with two of her minor children (Tr. 628).

PROCEDURAL HISTORY

Plaintiff provides the following procedural history:

Ms. Christy protectively filed an application for supplemental
security income on January 29, 2009, wherein she alleged disability on
January 1, 2008 (Tr. 123-125). Her applications were denied at the initial
determination and reconsideration stages (Tr. 84-87, 91-93). Ms. Christy
thereafter filed a Request for Hearing (Tr. 94-96). A hearing was held
before an administrative law judge on December 17, 2010 in Portland,
Oregon (Tr. 46-64). The ALJ issued a decision on December 29, 2010,
denying plaintiff's claim (Tr. 14-37). Plaintiff appealed the decision to the
Appeals Council on February 23, 2011, and an Order denying review of
the decision of the ALJ was issued on January 19, 2012 (Tr. 1-9).
Ms. Christy filed an action in the United States District Court for
the Western District of Washington on March 21, 2012 (Tr. 760-762). On
December 4, 2012, an Order was issued by United States Magistrate
Judge J. Richard Creatura, remanding the case to the Commissioner,
pursuant to sentence four of 42 U.S.C. § 405(g) (Tr. 704-727). The
Appeals Council issued a further Order dated May 24, 2013, vacating the
hearing decision dated December 29, 2010 and remanding the case back
to the ALJ (Tr. 728-731).
A hearing was held on December 6, 2013 before an ALJ (Tr. 672-
703). The ALJ issued a decision on January 6, 2014, denying plaintiff's
claim (Tr. 620-649). Following this decision, plaintiff did not file written
exceptions with the Appeals Council, and the Appeals Council did not
assume jurisdiction. Ms. Christy thereafter made timely appeal to the
instant court seeking review of the denial of benefits.

(*See* Plaintiff's Opening Brief, ECF No. 12, pp. 1-2).

Plaintiff raises the following issues: (1) Whether or not the ALJ properly evaluated the medical issues; and (2) Did the ALJ provide clear and convincing reasons to discredit plaintiff's testimony (*see* Defendant's Brief, ECF No. 16, p. 2).

STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court may set aside the Commissioner's denial of social security benefits if the ALJ's findings are based on legal error or not supported by substantial evidence in the record as a whole. *Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005) (*citing Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999)).

DISCUSSION

(1) **Whether or not the ALJ properly evaluated the medical issues.**

Plaintiff contends that the ALJ failed to evaluate appropriately multiple medical opinions. Defendant contends that the ALJ provided specific and legitimate rationale for failing to credit the opinions, and also provided a sufficiently detailed and thorough discussion of the evidence in the record.

When an opinion from an examining or treating doctor is contradicted by other medical opinions, the treating or examining doctor's opinion can be rejected "for specific and legitimate reasons that are supported by substantial evidence in the record." *Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1996) (*citing Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir. 1995); *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983)). The ALJ can accomplish this by "setting out a detailed and thorough summary of the facts and

conflicting clinical evidence, stating his interpretation thereof, and making findings."

*Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (*citing Magallanes v. Bowen*, 881

F.2d 747, 751 (9th Cir. 1989)).

    A.  Dr. Wendy Biss, Ph.D., examining doctor

    Dr. Biss examined plaintiff in May 2008 (*see* Tr. 324-33). Dr. Biss noted

plaintiff's report of recurring feelings of depression on most days, as well as returning

anxiety when outside her home and recurring feelings of hopelessness (*see* Tr. 327). Dr.

Biss noted plaintiff's report that she was having difficulty leaving the home and being

around people (*see* Tr. 328). Regarding plaintiff's mini mental status examination, Dr.

Biss noted that plaintiff "consecutively completed forward digit span up to six digits"

(*see id.*). Although Dr. Biss noted that plaintiff appeared to have more difficulty with

tasks related to abstract reasoning, Dr. Biss opined that this result "may have reflected her

minimal effort on these tasks" (*see id.*). Although plaintiff "did not attempt abstract

reasoning related to proverbs, [plaintiff] was able to provide correct answers to all

similarities" (*see id.*). Dr. Biss noted that when plaintiff was asked questions related to

comprehension and ways to manage basic safety behaviors, plaintiff "also appeared to

give limited effort and appeared somewhat uncooperative" (*see id.*). Dr. Biss noted that

plaintiff's "answers were often quick and brief, with limited effort or thought" (*see id.*).

Dr. Biss provided an example: when plaintiff was answering the question regarding why

individuals are expected to pay taxes, "she reported, 'never had to pay taxes, so it doesn't

catch up to you later'" (*see id.*).

Plaintiff reported that she consumed alcohol infrequently at social events (*see id.*). Dr. Biss also noted plaintiff's report that "her Valium doesn't help and she often over uses the medication" (*see id.*). Dr. Biss noted that plaintiff "reported that she left school in eighth grade due to behavioral difficulties" (*see* Tr. 329). Dr. Biss noted that plaintiff "reported that when she placed effort into her behaviors she was capable of receiving A's" (*see id.*). Dr. Biss noted plaintiff's report of very few jobs since her teenage years (*see id.*).

Dr. Biss noted that plaintiff reported that she had driven herself to the interview, but also reported that her driver's license was invalid, but that she continues to drive anyway (*see* Tr. 329–30). Dr. Biss also noted that plaintiff did not show up for her previously scheduled appointment "and could not provide an explanation of what precipitated her absence from the first scheduled appointment" (*see* Tr. 330).

Dr. Biss opined that plaintiff's mood throughout the interview and testing "was somewhat incongruent to her reported affect of anxious and depressed" (*see id.*). Dr. Biss noted that plaintiff appeared lethargic, detached, bored, and disinterested, but that her reported "anxiety was not visibly noticeable" (*see id.*). Dr. Biss observed that plaintiff's speech often was "overly vague and contradictory" and that plaintiff appeared somewhat uncooperative (*see id.*). Dr. Biss opined that although plaintiff's speech was slow, it was logical (*see id.*).

Regarding plaintiff's mini-mental status exam (MMSE) results, Dr. Biss noted that plaintiff fell within the normal range for her performance (*see id.*). Dr. Biss also noted that plaintiff did not appear to have any deficits in her remote or recent memory, although

1   she appeared to have the most difficulty with delayed recall (*see id.*). Dr. Biss opined that

2   based on plaintiff's presentation during testing, plaintiff "appeared able to: easily read

3   and write small sentences, perform immediate recall, name common objects, perform

4   basic attention tasks, such as spelling backwards, perform basic repetition, perform tasks

5   of visual motor integration, and follow three-step commands" (*see id.*).

6          Dr. Biss also conducted objective testing regarding the validity of plaintiff's self

7   reports. As noted in the 2008 opinion by Dr. Biss, the "Structured Inventory of

8   Malingered Symptomatology (SIMS) is a 75 – item self-report measure that is used to

9   detect malingering across a wide variety of clinical and forensic settings, [and a] SIMS

10  Total Score of 14 or greater is used to detect malingered responding and provides a high

11  level of sensitivity and specificity [while] a cutoff score of 16 is often used to enhance

12  diagnostic accuracy and correctly identify 90% of malingerers and 98% of honest

13  responders" (Tr. 330). As noted by Dr. Biss, plaintiff's "Total Score for the SIMS was a

14  38, therefore far outweighing the conservative cutoff score of 16" (*see id.*). Dr. Biss noted

15  that plaintiff "over reported symptoms in every category except psychosis" (*see id.*).

16          Dr. Biss opined that plaintiff's "performance on the SIMS along with her erratic

17  and apathetic performance throughout testing indicate that she likely overreported her

18  level of distress and level of cognitive impairment" (*see* Tr. 331). Dr. Biss opined that it

19  was "very likely that her scores on the MMSE and measures of ADL's may not be wholly

20  accurate depictions of her current functioning" (*see id.*). Dr. Biss also indicated her

21  opinion as follows: "[Plaintiff's] scores on the SIMS indicate a very high likelihood that

22  she overreported symptoms of impairment and failed to perform a full effort on all

measures. Due [to] the potential for monetary gain and her reported inability to sustain full – time employment in the past malingering is strongly suspected" (*see id.*). For one of her recommendations, Dr. Biss indicated that "[when] interpreting the results be cautious as it is very likely [plaintiff] overreported her level of dysfunction and did not perform fully on all tasks" (*see id.*).

Among her major findings, Dr. Biss indicated that plaintiff's "overreporting of symptoms, use of lying for personal gain, likelihood of malingering, consistent irresponsibility, and lack of remorse appear consistent with Antisocial traits" (*see* Tr. 332). Dr. Biss noted plaintiff's report that plaintiff indicated she was capable of receiving A's in school when she placed effort into her behaviors, and noted that during the interview, plaintiff "spoke in a very self pitying and contradictory manner" (*see id.*). Dr. Biss indicated that it "was very difficult to ascertain the accuracy of her reporting due to her inconsistency" (*see id.*).

Dr. Biss indicated that plaintiff likely would have difficulty accepting instruction from others because of plaintiff's apathy, disinterest, and difficulties with authority (*see* Tr. 333). She indicated that plaintiff's difficulty in this area was moderate (*see* Tr. 325). Dr. Biss also opined that based on plaintiff's MMSE performance, "and her answers to questions throughout the diagnostic interview she appears to [be] able to support herself based on her cognitive abilities" (*see* Tr. 333). Dr. Biss opined that plaintiff's lack of full completion of her household chores "appears largely related to her apathy, lack of motivation, and anhedonia" (*see id.*).

1    The ALJ discussed the 2008 opinion of Dr. Biss (*see* Tr. 637). The ALJ included

2  the following discussion in his written decision:

3          Wendy Biss, Ph.D., completed a medical source statement of ability to
4          do work–related mental activities in May 2008. She also provided an
           adult diagnostic assessment (internal citation to Ex. 11F). Dr. Biss
5          opined the claimant's ability to understand, remember and carry out
           instructions is not affected by her impairments. She has no limitation in
6          her ability to respond appropriately to usual work situations and to
           changes in a routine work setting. She has moderate limitation in the
7          ability to interact appropriately with the public, supervisors, and co—
           workers because of antisocial/borderline personality traits (internal
8          citation to Ex. 11F/2). This opinion is given little weight because of the
           claimant's lack of credibility and because of Dr. Biss' findings regarding
9          potential malingering. Objective testing in the form of the structured
           inventory of malingered symptomatology (SIMS) reflected over
10         reporting of unlikely symptoms in every category except psychosis
           (internal citation to Ex. 11F/7). The claimant's performance on the
11         Minnesota Multiphasic Personality Inventory (MMPI-2) administered by
           another examiner also revealed that the claimant was endorsing
12         infrequent, unlikely and unrealistic psychiatric symptoms (internal
           citation to Ex. 19F/5). Dr. Biss concluded that based on the claimant's
13         erratic and apathetic performance throughout testing, malingering was
           strongly suspected (internal citation to Ex. 11F/8). Such evidence of lack
14         of effort mirrors problems with the claimant's performance noted by the
           consultative examiner who evaluated the claimant's physical
15         impairments (internal citation to Ex. 23F/6-7). Giving the claimant's
           complaints of social anxiety (internal citation to Ex. 19F/2) and alleged
16         difficulties with concentration (internal citation to Ex. 19F/3) a modicum
           of weight against the backdrop of her estimated average IQ (internal
17         citation to Ex. 19F/4), the undersigned added limitations restricting the
           claimant to unskilled work with limited public interactivity.
18

19  (Tr. 637-38).

20         Based on a review of the record, the Court concludes that the ALJ's

21  characterizations and findings are based on substantial evidence in the record as a whole.

22  As noted by the ALJ, in addition to the SIMS, another objective psychological test, which

23  was conducted by Dr. Robert E. Schneider, Ph.D., in October, 2008, the MMPI-2

24

ORDER ON PLAINTIFF'S COMPLAINT - 9

(Minnesota Multiphasic Personality Inventory), also "indicates over-reporting of symptoms" (*see* Tr. 375). As noted by Dr. Schneider, plaintiff "was endorsing infrequent, unlikely and unrealistic psychiatric symptoms" (*see id.*). The Court also notes that Dr. Biss included in her opinion the recommendation that one "be cautious" when interpreting the results indicated in the opinion because "it is very likely [plaintiff] over reported her level of dysfunction and did not perform fully on all tasks" (Tr. 331).

For the reasons stated and based on a review of the record as a whole, including the ALJ's thorough discussion "of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings," the Court concludes that the ALJ provided specific and legitimate rationale for failing to credit fully all the opinions included in Dr. Biss' report. *See Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (*citing Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)); *see also Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1996) (*citing Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir. 1995); *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983)).

B.  Dr. Robert Schneider, Ph.D., examining doctor

Dr. Schneider examined plaintiff on two occasions, most relevantly, in October 2008, after plaintiff's head injury (*see* Tr. 371-76). Dr. Schneider noted plaintiff's report that her "thinking has been confused since the accident" (*see* Tr. 372). He noted her report that she felt as if her biggest problem was her memory (*see id.*). He noted her report that when she watches television she cannot remember what she was watching after commercial breaks (*see id.*). He also noted that she reported being anxious and attempted to avoid being with more than one person (*see id.*). Dr. Schneider noted

plaintiff's report of depression and high anxiety, along with frequent panic attacks and social anxiety (*see id.*).

Dr. Schneider also indicated plaintiff's report that a doctor at Family Health Center diagnosed her with attention deficit disorder (*see* Tr. 373). Dr. Schneider noted that plaintiff ranked her depression "as 10 out of 10, with 10 being the worst depression she could imagine and anxiety is 10 out of 10" (*see id.*). He noted plaintiff's report that there was nothing enjoyable in her life anymore (*see id.*). Dr. Schneider also noted plaintiff's report that plaintiff "was able to work until she suffered her head injury" (*see id.*). He also noted her opinion that she "would have to work alone because she has difficulty being around others" (*see* Tr. 374). Regarding her vocational interests, Dr. Schneider noted plaintiff's report that "there is nothing that she can think of that she is able to do" (*see id.*).

Dr. Schneider also conducted a mental status evaluation and noted plaintiff's extremely flat affect and that she was very slow to respond, demonstrating extremely low energy (*see id.*). He indicated that plaintiff barely had sufficient energy to perform the tests and noted various tests that she was not able to perform, such as her struggle to conduct serial three subtractions and serial seven additions (*see id.*). However, he noted that she responded appropriately to a question testing her judgment, was able to interpret proverbs accurately and was able to identify similarities between objects (*see id.*).

Dr. Schneider administered a number of tasks, such as the Weschler Adult Intelligence Scales test, which indicated that plaintiff's IQ was equivalent to 97, which placed her precisely at the average level (*see id.*). He also administered Trails A and B, in

which plaintiff was asked to connect sequentially various numbered dots, and opined that

her score on Trails B was impaired relative to her intelligence (*see id.*). Dr. Schneider

administered the Verbal Memory Subtest, in which plaintiff scored at the lower end of

the low average range, which was below expected level but did not indicate severe

impairment (*see* Tr. 375). Dr. Schneider administered the Fluency Subtests from the

Woodcock Johnson –III and noted that she "scored at the 11th grade level on the Reading

Fluency Test and the 7.1 grade level on the math fluency" (*see id.*).

   The Court noted previously the MMPI –2 test administered by Dr. Schneider, *see*

*supra*, section 1.A (*see id.*). He noted that her "F – K index was 17, which invalidates the

profile and indicates over reporting of symptoms" (*see id.*). Dr. Schneider noted that

similarly, plaintiff generated a "T – score of 92 on the exaggeration of impairment scale"

and that plaintiff also "generated an extremely high score on the scale that indicates she

was endorsing infrequent, unlikely and unrealistic psychiatric symptoms" (*see id.*). Dr.

Schneider noted that plaintiff's profile was "definitely exaggerated," but Dr. Schneider

opined that plaintiff was "an individual who views herself as the sum of her symptoms

and, in fact, one of the characteristics of post concussive syndrome is a wide range of

unexplainable symptoms and physical difficulties" (*see id.*). The Court notes that, as

argued by defendant, this aspect of Dr. Schneiders' opinion suggests that he found

plaintiff's exaggeration to demonstrate only a symptom of plaintiff's brain injury, as

opposed to reflecting any attempt on the part of plaintiff to exaggerate her symptoms or

to present herself as more disabled than she actually was (*see* ECF No. 16, p. 8).

Subsequently, Dr. Schneider indicated his opinion that plaintiff described "residual symptomatology that is very consistent with the head injury" (*see* Tr. 376).

As noted by the ALJ, Dr. Schneider indicated that with the number of cognitive and physical problems with which plaintiff presented, Dr. Schneider opined that it was very unlikely that plaintiff could sustain the typical demands of gainful employment (*see* Tr. 375). He opined that it was unlikely that plaintiff could tolerate the typical stresses, demands or expectations of competitive employment at that time (*see* Tr. 376). Dr. Schneider opined that there was a lack of evidence demonstrating ADHD, and that the "PTSD like symptoms are more of a concern than actual PTSD symptoms," opining that "this does not fit the criteria for traumatic events" (*see id.*). Dr. Schneider indicated that he did not have "sufficient time to develop a clear chronology of the development of all these symptoms, many of which may be related to the head injury" (*see id.*). He also found that her social anxiety required further exploration and also probably was related to the head injury.

The ALJ gave "little weight" to Dr. Schneider's opinion (*see* Tr. 638). The ALJ reasoned as follows:

> It is inconsistent with the objective testing (SIMS and MMPI – 2) showing that the claimant exaggerated her symptoms and was likely malingering as well as with evidence of inconsistent statements about the claimant's abilities. It also does not square with recent evidence showing improved function with medication when taken as prescribed. It is also inconsistent with the claimant['s] marginal work history even prior to her experiencing her head injury, as already explained.

(Tr. 638).

1   Based on the record as a whole, the Court concludes that the ALJ's findings are

2   supported by substantial evidence in the record as a whole. First, as noted by the Court's

3   description of the opinion of Dr. Schneider, he opined that plaintiff's symptomatology

4   was related to her head injury, however, as noted by the ALJ, even in "the six years prior

5   to [plaintiff's] accident, however, she earned only $5931" (*see* Tr. 635). The ALJ also

6   noted that plaintiff's total "lifetime earnings amount to $21,451" (Tr. 634). The ALJ

7   inferred from this evidence that "factors other than her alleged impairments affect her

8   ability to maintain full-time employment," additionally noting that plaintiff's overuse of

9   Valium, as reported to Dr. Biss, may have been "contributing to her lack of motivation to

10  work" (*see* Tr. 635 (*citing* Tr. 328)).

11  The ALJ may "draw inferences logically flowing from the evidence." *Sample v.*

12  *Schweiker*, 694 F.2d 639, 642 (9th Cir. 1999) (*citing Beane v. Richardson*, 457 F.2d 758

13  (9th Cir. 1972); *Wade v. Harris*, 509 F. Supp. 19, 20 (N.D. Cal. 1980)). However, an ALJ

14  may not speculate. *See* SSR 86-8, 1986 SSR LEXIS 15 at *22. The Court concludes that

15  the ALJ's inference that plaintiff's work history suggests a lack of motivation to work, as

16  does her overuse of her Valium prescription even though she indicated that it did not

17  work, are "inferences logically flowing from the evidence." *See Sample*, *supra,* 694 F.2d

18  at 642 (citations omitted). The Court also concludes that this finding, supported by

19  substantial evidence in the record, provides a specific and legitimate reason for failing to

20  credit fully the opinions of Dr. Schneider, who opined that plaintiff's symptomatology

21  was related to her head injury, as opposed to her lack of motivation to work.

Similarly, as alluded to previously, Dr. Schneider appeared not to credit fully the MMPI–2 results which indicated that plaintiff was overreporting symptoms, exaggerating, and endorsing infrequent, unlikely and unrealistic psychiatric symptoms (*see* Tr. 375). Instead, Dr. Schneider appeared to opine that these results merely reflected further symptoms of plaintiff's head injury (*see id.*). The ALJ, however, unlike Dr. Schneider, also had evidence of plaintiff's results from the Structured Inventory of Malingered Symptomatology (SIMS), the results of which "far outweigh[ed] the conservative cutoff score" (*see* Tr. 330). As discussed in detail previously, this objective test used to detect malingering was evaluated thoroughly by Dr. Biss (*see id.*). Dr. Biss reviewed plaintiff's subscale scores, and found that they "revealed that her inflated SIMS Total Score was due to overreporting of unlikely symptoms for: (1) neurological impairment, (2) Affective Disorder, (3) Low IQ, and (4) Amnesia" (*see id.*). Therefore, Dr. Biss, in contrast to Dr. Schneider, opined that plaintiff "likely overreported her level of distress and level of cognitive impairment," and "strongly suspected" malingering (*see* Tr. 331).

The ALJ is responsible for resolving ambiguities and conflicts in the medical evidence. *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) (*citing Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)). In this matter, unlike Drs. Biss and Schneider, the ALJ had access to both plaintiff's SIMS test results as well as her MMPI-2 test results. Both of these objective tests indicated that plaintiff was overreporting her symptoms and was exaggerating, endorsing infrequent, unlikely and unrealistic psychiatric symptoms (*see* Tr. 330, 375).

For the stated reasons, the Court concludes that the ALJ's finding that the opinions of Dr. Schneider were "inconsistent with the objective testing (SIMS and MMPI-2) showing that the claimant exaggerated her symptoms and was likely malingering" is a finding based on substantial evidence in the record as a whole. The Court also concludes that this finding entails specific and legitimate rationale for failing to credit fully the opinion of Dr. Schneider.

The ALJ also found that Dr. Schneider's opinion was inconsistent with evidence of inconsistent statements about plaintiff's abilities. Despite plaintiff's report to Dr. Schneider that she attempted not be around more than one person and that she suffered from social anxiety (*see* Tr. 372), as noted by the ALJ, plaintiff reportedly maintained the ability to shop in stores 2 to 3 times a month and she reported that she attends social events (*see* Tr. 631 (*citing* Ex. 3E, 11F/5)). These findings are based on substantial evidence in the record (*see* Tr. 147, 328). For example, plaintiff reported to Dr. Biss that she consumed "alcohol infrequently at social events" (*see* Tr. 328).

Similarly, the ALJ found that Dr. Schneider's opinion was not consistent "with recent evidence showing improved function with medication when taken as prescribed" (*see* Tr. 638). This finding, too, is based on substantial evidence in the record as a whole, as will be discussed in further detail in the Court's discussion of the ALJ's rejection of the opinion of Dr. Kay Stradinger, Psy.D, *see infra*, section 1.C.

For the reasons stated herein and based on the record as a whole, the Court concludes that the ALJ provided specific and legitimate rationale for his failure to credit fully all the opinions from Dr. Schneider. *See Reddick v. Chater*, 157 F.3d 715, 725 (9th

1    Cir. 1998) (*citing Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)); *see also*

2    *Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1996) (*citing Andrews v. Shalala*, 53 F.3d

3    1035, 1043 (9th Cir. 1995); *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983)).

4

5           C.  Dr. Kay L. Stradinger, Psy.D., examining doctor

6           Dr. Stradinger examined plaintiff in August 2013, approximately five months

7    before the ALJ's written decision (*see* Tr. 821-32, 641). Dr. Stradinger noted plaintiff's

8    report that she first had depressive symptoms when she was 16 (*see* Tr. 821). She also

9    noted plaintiff's report that her depression was better managed "now because she was

10   started on mood stabilizers six months ago and she thinks it helps her mood a little" (*see*

11   *id.*). She also noted plaintiff's report that "her OCD is not so bad now" (*see* Tr. 822). Dr.

12   Stradinger noted plaintiff's report that "she has social disorder" (*see id.*). Further

13   indicating potential reliance on plaintiff's self-report, Dr. Stradinger also noted plaintiff's

14   report that "memory loss is her 'biggest concern now'" (*see id.*).

15          Dr. Stradinger noted plaintiff's report that plaintiff "does not work well with

16   others" and that "she has issues with authority and always has" had such issues (*see* Tr.

17   824). Dr. Stradinger noted plaintiff's opinion that "she believes she has no problems with

18   abuse of or dependence on prescription medications," (*see id.*), in contrast to plaintiff's

19   report to Dr. Biss that "she often over uses the medication," Valium (*see* Tr. 328), and to

20   other reports of improper use of medications (*see, e.g.,* Tr. 508) and in contrast to Dr.

21   Biss' opinion that plaintiff had a likelihood of "abuse [of] prescribed medications" (*see*

22   Tr. 332).

23

24

Dr. Stradinger performed a mental status examination (*see* Tr. 825-27). She noted that plaintiff "came in stating she had a migraine and that the lights in the waiting room and this room were terrible for her[, y]et when the examiner asked her if we could turn the overhead lights off, she said, 'no, thank you,' because it wouldn't help" (*see* Tr. 825). Dr. Stradinger opined that plaintiff's thought processes were goal directed, her voice was clear for understanding, and she spoke with an average rate, rhythm, volume, and of an above average amount (*see id.*).

Regarding plaintiff's memory performance, Dr. Stradinger indicated that plaintiff "could complete a five – digit span forward and a five – digit span backward on the first trials for low average and high average performances respectively" (*see* Tr. 826). Plaintiff was able to "complete a six – digit span forward on the second trial and a seven – digit span forward on the first trial," although she was unable to complete a six – digit span backward on one trial (*see id.*). Regarding recent memory, plaintiff was able to repeat three out of three simple words on the first trial, and after about seven minutes, plaintiff successfully recalled two out of three words and with a clue could recall the third word, which Dr. Stradinger opined was a "slight impairment" (*see id.*).  Regarding plaintiff's memory for the past, plaintiff was able to report her birthday, phone number, and address without difficulty (*see id.*).

Dr. Stradinger opined that plaintiff demonstrated below average fund of knowledge and information as she "could name the current US president and name two of the three previous to him, but not in the correct order, [and] could name 2/2 states bordering Washington" (*see id.*). Plaintiff refused to attempt serial sevens, however,

plaintiff "attempted serial 3s starting with 20 and correctly calculated backward to 11 before she stopped, saying, 'This irritates me because it should be so simple'" (*see id.*). Plaintiff was able to complete three simple arithmetic problems correctly (*see id.*).

Regarding her concentration, plaintiff demonstrated the ability to spell WORLD correctly both forward and backward (*see id.*). Regarding plaintiff's abstract thinking, Dr. Stradinger indicated as follows:

> [Plaintiff] said *No ifs, ands, or buts* means, "No, it's not happening." When presented with *The grass is always greener on the other side* she asked if you have to agree, then she said it meant, "They want something better than theirs." She said *Rome wasn't built in a day* means, "It takes time."

(Tr. 826).

Regarding testing on similarities and differences, plaintiff "said a dog and lion are alike because they are animals and different because they are from the dog and cat family" (*see* Tr. 827). Dr. Stradinger opined that plaintiff's judgment and insight were fair to adequate (*see id.*). She noted that if plaintiff "found a letter on the sidewalk she would put it in the mailbox [and] [if] she was in a movie theater and smoke broke out, suggesting fire, she would get out and pull the fire alarm" (*see id.*).

Dr. Stradinger diagnosed plaintiff with bipolar disorder not otherwise specified and indicated that this diagnosis was "per history" and also diagnosed PTSD, similarly indicating that this diagnosis was "per history" (*see id.*). Dr. Stradinger also diagnosed plaintiff with panic disorder with agoraphobia (*see id.*). She opined that plaintiff's global assessment of functioning (GAF) was 51 (*see id.*).

1    With respect to her discussion and prognosis, Dr. Stradinger indicated that

2    plaintiff had "good memory for having applied for SSI and immediately was asking how

3    long this would be and remembering that she had to do a bunch of puzzles and things in

4    the last evaluation she was required to go to" (*see id.*). Dr. Stradinger indicated that

5    plaintiff "tended not to go into specific details regarding her past unless specifically

6    asked, so given the limited time today the specific criteria for some of her many

7    diagnoses could not be pinpointed such as PTSD, ADHD, and bipolar disorder" (*see id.*).

8    Dr. Stradinger indicated that "it appears she has had treatment in the past according to the

9    records and those providers have previously diagnosed her according to criteria over

10   time" (*see id.*).

11

12   Dr. Stradinger noted that plaintiff expressed little concern about OCD or ADHD

13   or social phobia at her appointment and "stated that she was independent for all ADL's

14   yet also stated that she needs her child with her to drive or to grocery shop, indicating

15   some inconsistency or ambivalence" (*see id.*). Dr. Stradinger indicated that although

16   plaintiff stated that she mostly was concerned with memory loss, plaintiff "seemed to do

17   quite well for memory in the exam today, however" (*see id.*).

18   Regarding her functional assessment and medical source statement, Dr. Stradinger

19   indicated that plaintiff was "capable of managing her funds, based on her cognitive level

20   of function" (*see* Tr. 828). Dr. Stradinger opined that plaintiff had "marked impairment

21   for accepting instructions from supervisors given her personality and perhaps related also

22   to anxiety" (*see id.*). She also opined that plaintiff had "marked impairment in interacting

23   with coworkers and the public given her problems with social skills and relationships"

24

(*see id.*). She opined that plaintiff had "moderate impairment for performing work activities on a consistent basis without special or additional instruction," related to plaintiff's problems with recall and problems with persistence, as well as potentially being related to anxiety (*see id.*). Dr. Stradinger opined that plaintiff had "marked persistence for maintaining regular attendance in the workplace and completing a normal workday/workweek without interruptions from her anxiety and depression" (*see id.*). Finally, she opined that plaintiff had "marked impairment for dealing with the usual stress encountered in the workplace," related to problems with coping skills, which may be triggered by anxiety or depression (*see id.*).

The ALJ included the following discussion in his written opinion:

> Kay Stradinger, Psy.D., performed a consultative examination with the claimant in August 2013. She diagnosed the claimant with bipolar disorder, NOS, per history; posttraumatic stress disorder (PTSD), per history; panic disorder with Agoraphobia; cluster B traits and rule out diagnoses of attention deficit hyperactivity disorder (ADHD) and opioid dependence in a controlled setting (internal citation to Ex. 34F/7). She opined in one instance that the claimant is capable of managing her funds and in another that she is not. She opined further that the claimant is unimpaired for performing simple and repetitive tasks. The claimant has a marked impairment for accepting instructions from supervisors and for interacting with coworkers and the general public. The claimant has a moderate impairment for performing work activities on a consistent basis without special or additional instruction. The claimant also has a marked impairment in persistence for maintaining regular attendance in the workplace, for completing a normal workday and for dealing with the usual stress encountered in the workplace (internal citations to Ex. 34F/7-8, Ex. 35F/1-3). Dr. Stradinger's opinion is given little weight except for her assessment of the claimant's ability to perform simple work, which is consistent with her performance on a mental status examination and squares with objective intelligence testing. Otherwise the opinion is inconsistent with that of Dr. Moore who reviewed the entire medical evidence record. Dr. Stradinger reviewed only the CBS crisis plan and notes from Peace Mental Health providers (internal

citation to Ex. 34F/1). Dr. Stradinger provided contradictory statements as to whether the claimant was capable of managing her own benefits. In addition, Dr. Stradinger's assessment does not square with Dr. Biss' findings of potential malingering and Valium abuse. Dr. Stradinger also does not account for evidence showing improvement with symptomatology with therapy and medication and evidence of medication non-compliance.

(Tr. 637).

Despite Dr. Stradinger's August 2013 opinion of plaintiff's multiple marked limitations, the ALJ discussed how plaintiff's symptoms actually improved over time when she was taking her medications as prescribed, which the ALJ also found that she did not always do. For example, the ALJ noted as follows:

The claimant's statements to Brent Francisco, an ARNP, or treating mental health provider, on February 2008, are seemingly incongruous with a person who alleges onset of depression during the previous month. She told Mr. Francisco that Cymbalta is helping, with no bad side effects. She reported decreased pain allowing her to go to the park more often with her children. She stated things were going well overall. Mr. Francisco observed she was well groomed and estimated her global assessment of functioning (GAF) score to be 55 (internal citation to Ex. 20F/9-10). In mental status examinations in March 2012 and January 2013, the claimant's mood, affect, judgment, insight, memory, attention, concentration and thought content were all within normal limits (internal citation to Ex. 45F/33, 41). In February 2013, the claimant reported she was 'doing okay' with her bipolar depression (internal citation to Ex. 45F/27).

(Tr. 631 (footnote omitted)).

The ALJ's findings that plaintiff's mental health symptoms improved with medication and that she demonstrated test results within normal limits following mental status examinations are supported by substantial evidence in the record (*see id.*). On February 14, 2008, approximately one year before the relevant period of time for the

1    ALJ's decision (January 29, 2009), Mr. Brent Francisco, an ARNP, noted that plaintiff

2    indicated that she was getting about six hours of sleep; that she had not noticed much

3    difference in her depression, anxiety or pain management; and that she was not

4    experiencing any bad side effects from her medications (*see* Tr. 395). On May 5, 2008, at

5    her next appointment, according to the treatment record of Mr. Francisco, plaintiff "says

6    Cymbalta is helping and [she] has a bit less pain, [and] is getting out to the park with the

7    kids" (*see* Tr. 394). Plaintiff also reported that "overall things going okay" (*see id.*). This

8    treatment record supports the ALJ's finding that plaintiff's mental health improved when

9    she took her prescribed medication and that this improvement occurred even before the

10   relevant period of time for the ALJ's written decision (*see id.*).

11

12         Also as reported by Mr. Francisco, and as noted by the ALJ, plaintiff reported in

13   February, 2009 "that her mood is better with the recent increase of Cymbalta [and

14   plaintiff] [said] she feels happier and is having an easier time dealing with her kids" (*see*

15   Tr. 490). Mr. Francisco opined that plaintiff was demonstrating a better range of affect

16   than on her prior visit (*see id.*). Similarly, Mr. Francisco reported the subsequent month

17   that plaintiff reported that "things are better" and that she had a bit more energy, and her

18   sleep was okay (*see* Tr. 489). Mr. Francisco opined that plaintiff's mood was a bit better

19   (*see id.*). On April 20, 2009, plaintiff indicated that "things are going good [and that the]

20   only hangup is with her coverage for Cymbalta" (*see* Tr. 487). Plaintiff also indicated that

21   her "anxiety is under good control, mood as improved and sleep is good" (*see id.*). As

22   indicated by Mr. Francisco, plaintiff reported that "she has even noticed she is feeling

23   better on rainy days" (*see id.*). On May 26, 2009, plaintiff similarly reported to Mr.

24

Francisco that "everything is going fairly well" (*see* Tr. 485). Plaintiff indicated that her "meds are doing fine" (*see id.*). As noted by the ALJ, during plaintiff's "course of treatment with Mr. Francisco in the first half of 2009, her estimated GAF score increased from 51 to 56" (*see* Tr. 632 (internal citation to 485, 487, 489–91)).

Similarly, in February, 2010, plaintiff indicated that her medications "have been working better" (*see* Tr. 553). At the same appointment, she indicated that medication and counseling both had helped her in the past (*see id.*). On August 2, 2010, plaintiff described "her recent moods as happy," although the staff member noted that plaintiff did not appear happy (*see* Tr. 618). Less than a month later, on August 24, 2010, plaintiff "reported that she has been feeling really good lately due to her new [boyfriend]" and had gone camping over the previous weekend and reporting having a good time (*see* Tr. 616). On this occasion, the same staff member indicated that plaintiff "presented as happy, nicely groomed (makeup, jewelry), and was quite talkative" (*see id.*). The staff member indicated also that the tone of plaintiff's voice was stronger than it had been before (*see id.*).

Also as noted by the ALJ, in August, 2013, at plaintiff's most recent consultative examination prior to the ALJ's decision, plaintiff "state[d] her OCD is not so bad now," and she noted her intensive outpatient weekly treatment (*see* Tr. 822). At the same appointment, plaintiff indicated that her depression was "better managed now because she was started on mood stabilizers six months ago" (*see* Tr. 821; *see also* Tr. 631). In February 2013, as noted by the ALJ, plaintiff reported that she was "doing okay" with her bipolar depression (*see* Tr. 962).

For the reasons stated, the Court concludes that the ALJ's finding that such "evidence shows improvement in depressive symptoms with medication" is a finding based on substantial evidence in the record as a whole (*see* Tr. 633). The Court also concludes that the ALJ's finding of improvement of plaintiff's symptoms when she takes her prescribed medications supports the ALJ's failure to credit fully the opinion from Dr. Stradinger in August, 2013 regarding plaintiff's marked limitations from her mental health impairments. The ALJ's finding that "Dr. Stradinger also does not account for evidence showing improvement in symptomatology with therapy and medication and evidence of medication noncompliance" is a finding based on substantial evidence in the record as a whole. In addition, this is a specific and legitimate reason for failing to credit fully the opinions of Dr. Stradinger.

The ALJ also found that the opinion of Dr. Stradinger was inconsistent with the opinion "of Dr. Moore who reviewed the entire medical evidence record," noting that "Dr. Stradinger reviewed only the CBS crisis plan and notes from Piece Mental Health providers" (*see* Tr. 637 (internal citation to Ex. 34F/1)). Plaintiff argues against this rationale, noting that Dr. Margaret Moore only opined that plaintiff's mental health impairments did not meet one of the listed impairments (*see* ECF No. 12, p. 18 (*citing* Tr. 677-86)). However, as noted by defendant, "Dr. Stradinger's assessment of multiple marked limitations essentially was that plaintiff's impairments met or equaled a listing and [as such] was clearly inconsistent with Dr. Moore's assessment" (*see* ECF No. 16, p. 11 (*citing* Tr. 828)). This finding by the ALJ also supports the ALJ's failure to credit fully the opinion of Dr. Stradinger.

1    Finally, the ALJ noted an inconsistency within the opinion of Dr. Stradinger, as

2    well as noting that Dr. Stradinger's opinion did not appear to account for any potential

3    malingering, as found by Dr. Biss (*see* Tr. 637). These findings are supported by

4    substantial evidence in the record as a whole, and they provide some support for the

5    ALJ's failure to credit fully the opinion of Dr. Stradinger.

6    For the reasons stated and based on the record as a whole, the Court concludes that

7    the ALJ provided sufficient specific and legitimate rationale for failing to credit fully the

8    opinions of Dr. Stradinger. *See Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)

9    (*citing Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)); *see also Lester v.*

10   *Chater*, 81 F.3d 821, 830-31 (9th Cir. 1996) (*citing Andrews v. Shalala*, 53 F.3d 1035,

11   1043 (9th Cir. 1995); *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983)).

12

13       D.  Drs. Jerry Gardner, Ph.D. and Eugene Fierman, M.D., state agency, non-
             examining medical consultants

14   Plaintiff complains that the ALJ failed to credit fully opinions from state agency,

15   non-examining medical consultants, Drs. Gardner and Fierman (*see* ECF No. 12, pp. 14-

16   16). In his written decision, the ALJ discusses the opinion of Dr. Gardner, whose opinion

17   was affirmed by Dr. Fierman (*see* Tr. 638).

18   The ALJ credited a portion of Dr. Gardner's opinion, but gave much of Dr.

19   Gardner's opinion "little weight" (*see* Tr. 638). The ALJ relied in part on his reasoning

20   that plaintiff "need not be limited to reading simple sentences as objective test scores

21   reveal a high school graduate level on reading fluency measures, a 9.1 grade level on the

22   letter – word identification subtests and reading comprehension at 11.3 grade level, and

23

24

[plaintiff] herself reported that she dropped out of high school because it was too easy" (*see id.* (*citing* Exhibit 19F/3)). This finding by the ALJ is supported by substantial evidence in the record, as Dr. Schneiders' 2008 report indicates that plaintiff "left school during the 10th grade because she was bored" (*see* Tr. 374), his 2003 report indicates that she reported that in high school she "was bored because it was 'too easy'" (*see* Tr. 378) and plaintiff reported to Dr. Biss in 2008 that "when she placed effort into her behaviors she was capable of receiving A's" (*see* Tr. 329).

The ALJ also specified that limitations with respect to "contact with coworkers are not warranted nor are additional limitations in the skill level of work as the record shows [plaintiff]'s subjective complaints of difficulties in social environments and difficulties with concentration, persistence or pace were found to be minimally credible based on SIMS and MMPI–2 testing" (*see* Tr. 638).

As discussed by the Court previously, *see supra*, section 1.A, Dr. Biss noted that plaintiff's "Total Score for the SIMS was a 38, therefore far outweighing the conservative cutoff score of 16" to detect malingering (*see* Tr. 330). Dr. Biss noted that plaintiff "over reported symptoms in every category except psychosis" (*see id.*). Similarly, also as noted previously, the MMPI-2 conducted by Dr. Schneider also "indicates over-reporting of symptoms," and as noted by Dr. Schneider, plaintiff "was endorsing infrequent, unlikely and unrealistic psychiatric symptoms" (*see* Tr. 375).

The ALJ "may reject the opinion of a non-examining physician by reference to specific evidence in the medical record." *Sousa v. Callahan*, 143 F.3d 1240, 1244 (9th Cir. 1998) (*citing Gomez v. Chater*, 74 F.3d 967, 972 (9th Cir. 1996)); *Andrews, supra*,

53 F.3d at 1041). Here, the ALJ specified multiple aspects of the record when failing to credit fully all of the opinion from state agency non-examining doctor, Dr. Gardner, whose opinion was affirmed by Dr. Fierman (*see* Tr. 638). Based on the record as a whole, the Court concludes the ALJ did not err when evaluating the medical evidence provided by Dr. Gardner, which was affirmed by Dr. Fierman. *See Sousa*, *supra*, 143 F.3d at 1244 (*citing Gomez v. Chater*, 74 F.3d at 972).

(2)   **Did the ALJ provide clear and convincing reasons to discredit plaintiff's testimony?**

Plaintiff argues that the ALJ failed to provide clear and convincing rationale for his failure to credit fully plaintiff's allegations and testimony (*see* ECF No. 12, pp. 19-23). Plaintiff contends that the ALJ "did not give specificity to what testimony he found not credible and what evidence showed the testimony was not credible" (*see id.*, p. 20). Although plaintiff acknowledges that the ALJ relied in part on objective testing results and opinion evidence demonstrating plaintiff's exaggeration, plaintiff argues that "the record shows [plaintiff's] performance on testing was consistent with a head injury and her personality disorder" (*see id.* (*citing* Tr. 332, 275). Regardless of the cause of plaintiff's exaggerated testimony, the fact that plaintiff over-reported symptoms and provided exaggerated testimony is clear and convincing rationale for the failure to credit fully her allegations. Defendant additionally argues that even if the Court concludes that the ALJ committed legal error in the evaluation of plaintiff's credibility, "the Court should uphold the ALJ's credibility determination" (ECF No. 16, p. 13 (*citing Carmickle v. Comm'r. Soc. Sec. Admin.,* 533 F.3d 1155, 1162 (9th Cir. 2008)).

1        If the medical evidence in the record is not conclusive, sole responsibility for

2   resolving conflicting testimony and questions of credibility lies with the ALJ. *Sample v.*

3   *Schweiker*, 694 F.2d 639, 642 (9th Cir. 1999) (*citing Waters v. Gardner*, 452 F.2d 855,

4   858 n.7 (9th Cir. 1971) (*Calhoun v. Bailar*, 626 F.2d 145, 150 (9th Cir. 1980)). An ALJ is

5   not "required to believe every allegation of disabling pain" or other non-exertional

6   impairment. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) (*citing* 42 U.S.C. §

7   423(d)(5)(A) (other citations and footnote omitted)). The ALJ may "draw inferences

8   logically flowing from the evidence." *Sample, supra*, 694 F.2d at 642 (*citing Beane v.*

9   *Richardson*, 457 F.2d 758 (9th Cir. 1972); *Wade v. Harris*, 509 F. Supp. 19, 20 (N.D.

10  Cal. 1980)). However, an ALJ may not speculate. *See* SSR 86-8, 1986 SSR LEXIS 15 at

11  *22.

12

13       Nevertheless, the ALJ's credibility determinations "must be supported by specific,

14  cogent reasons." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) (*citing Bunnell v.*

15  *Sullivan*, 947 F.2d 341, 343, 346-47 (9th Cir. 1991) (*en banc*)).  The ALJ may consider

16  "ordinary techniques of credibility evaluation," including the claimant's reputation for

17  truthfulness and inconsistencies in testimony regarding symptoms, and may also consider

18  a claimant's daily activities, and "unexplained or inadequately explained failure to seek

19  treatment or to follow a prescribed course of treatment." *Smolen v. Chater*, 80 F.3d 1273,

20  1284 (9th Cir. 1996) (citations omitted).

21       If an ALJ rejects the testimony of a claimant once an underlying impairment has

22  been established, the ALJ must support the rejection "by offering specific, clear and

23

24  convincing reasons for doing so." *Smolen, supra*, at 1284 (*citing Dodrill v. Shalala*, 12

1    F.3d 915, 918 (9th Cir.1993)); *see also Reddick, supra*, 157 F.3d at 722 (*citing Bunnell v.*

2    *Sullivan*, *supra*, 947 F.2d at 343, 346-47).

3        Here, the ALJ offered multiple reasons for failing to credit fully plaintiff's

4    allegations and testimony, such as her non-compliance with medical treatment and

5    improvement in mental health symptoms when compliant with medication; lack of

6    motivation to work; evidence of limited effort and exaggeration of symptoms; and

7    inconsistent statements. The evidence of limited effort and exaggeration of symptoms,

8    such as the SIMS report, the MMPI-2 test results, and the opinion by Dr. Biss that

9    plaintiff was not putting forth full effort, was discussed previously in the context of the

10    medical evidence, *see supra*, section 1 (*see also, e.g.*, Tr. 328, 330-31, 375). The Court

11    also notes the opinion of Dr. Mary White, M. D. that plaintiff seemed "to make a poor

12    effort during both the interview and the exam" (*see* Tr. 455-56). Likewise, regarding the

13    ALJ's finding that plaintiff exhibited a lack of motivation to work even prior to her head

14    injury, the Court already has discussed this finding and has found that it is based on

15    substantial evidence in the record as a whole, *see supra*, section 1.B. The Court also

16    concludes that plaintiff's lack of effort on testing and evidence of exaggeration, as well as

17    her demonstrated lack of motivation to work both support the ALJ's failure to credit fully

18    plaintiff's allegations and testimony.

19        Similarly, some of the evidence regarding the ALJ's finding that plaintiff was not

20    compliant with her prescribed treatment already has been discussed in the context of the

21    medical evidence, *see supra,* section 1. The Court also discussed already in detail the

22    ALJ's finding of plaintiff's improvement in symptomatology when compliant with her

1   prescribed treatment, *see supra*, section 1.C. In addition, the Court also notes here that on

2   April 22, 2008, plaintiff "reported that she has been advised to attend counseling, but has

3   been noncompliant" (*see* Tr. 328). As noted, plaintiff reported that although her Valium

4   prescription does not help, "she often over uses the medication" (*see id.*). Likewise,

5   regarding plaintiff's recommended physical therapy, the ALJ noted that in "September

6   2012, the claimant initiated physical therapy but canceled the subsequent appointment

7   and no – showed at her next appointment and was discharged from her physical therapy

8   plan" (*see* Tr. 629 (*citing* Ex. 42F/1, 4) (also noting that plaintiff's "doctors

9   recommended continued exercise rather than restricted activity levels")). Again, the

10  Court concludes that the ALJ's finding that plaintiff was non-compliant with prescribed

11  treatment is a finding based on substantial evidence in the record as a whole. As already

12  discussed, the Court also concludes that the ALJ's finding that plaintiff's symptoms

13  improved when she was compliant with prescribed treatment is a finding based on

14  substantial evidence in the record as a whole, *see supra*, section 1.C. These findings also

15  support the ALJ's failure to credit fully plaintiff's allegations and testimony.

16          Finally, the ALJ also noted a plethora of inconsistent statements by plaintiff. As

17  noted previously, *see supra*, section 1.B, plaintiff reported not wanting to leave the house

18  and reported avoiding being around more than one person, but also "reported consuming

19  alcohol infrequently at social events" (*see* Tr. 328, 372). Although on March 28, 2009

20  plaintiff reported that "she is unable to do almost anything; she lies around most of the

21  time," and at her first hearing on December 17, 2010, plaintiff testified that she does not

22  do household chores because it hurts too much (*see* Tr. 658), in May, 2012, plaintiff

1   reported being a caregiver for her mother because her mother had broken her leg (*see* Tr.

2   902).

3          On December 17, 2010, plaintiff testified that she cannot use a cane or walker to

4   get around because it hurts her wrists (*see* Tr. 656), and at her second administrative

5   hearing on December 6, 2013, plaintiff testified that although her "wrists are still too

6   weak to do most things," (*see* Tr. 695), she testified that she now was using a cane and

7   had been using the cane for "a few years at least" (*see* Tr. 692).

8          The ALJ noted that in the April 2008 evaluation by Dr. Biss, plaintiff reported

9   discomfort when sitting and moving, however the doctor observed that plaintiff did not

10  express discomfort or move excessively during the 90 minute interview (*see* Tr. 633

11  (*citing* Tr. 327)). This finding by the ALJ is supported by substantial evidence in the

12  record, as Dr. Biss' report includes the following: "[Plaintiff] reported discomfort when

13  sitting and moving. However, she did not express discomfort or move excessively when

14  interviewed in the 1.5 hour time" (Tr. 327). Similarly, the ALJ noted that plaintiff

15  testified at her first administrative hearing in December, 2010 that she could only sit for

16  about "a half hour" (*see* Tr. 664), however in January, 2009, plaintiff reported to Mr.

17  Francisco that she "has been doing nothing but sits" (*see* Tr. 391; *see also* Tr. 633).

18         The ALJ also noted that plaintiff reported to Dr. White in March, 2009 "that her

19  11-year-old son does the cooking in the home because she cannot stand" (*see* Tr. 455),

20  however plaintiff reported to Ms. Ellen Walker on April 19, 2010, that her son "refuses to

21  do chores around the house" (*see* Tr. 518).

1        The ALJ also discussed plaintiff's inconsistent statements regarding her drug and

2   alcohol use (*see* Tr. 634). For example, as noted by the ALJ, plaintiff went to the

3   emergency room on February 17, 2010 complaining of rectal pain and stated that she was

4   "overusing her methocarbamol and other medications" and reported that she also was

5   "drinking alcohol for her pain and state[d] that she drinks every single day" (*see* Tr. 508).

6   The ER physician noted that plaintiff "was quite upset that I would not give her anything

7   further for pain" (*see* Tr. 509). On February 23, 2010, plaintiff admitted using

8   methamphetamine in the past at age 16 (*see* Tr. 544). The ALJ also noted that, in addition

9   to the report to Dr. Biss that plaintiff overused her Valium (*see* Tr. 328), plaintiff

10   admitted in June, 2011 "that she did have a problem with prescription narcotic abuse in

11   the past, and was getting medications from family members in addition to doctors" (*see*

12   Tr. 945). Similarly, on June 20, 2011 plaintiff "admitted to taking more pain meds than

13   she needed to and this kept her in bed" (*see* Tr. 853).

14

15        In contrast to these admissions by plaintiff, as noted by the ALJ, in September

16   2011, plaintiff "stated that she rarely drinks alcohol and denied any toxic habits" (*see* Tr.

17   634 (*citing* Tr. 843)); and, in the following month, on October 19, 2011 plaintiff denied

18   any "history of drinking or drug abuse" (*see* Tr. 848). Similarly, in May, 2012, plaintiff

19   indicated that she drank "alcohol on occasion and denied any current or previous illicit []

20   substance use or abuse including marijuana" (*see* Tr. 900). However, in August, 2013,

21   plaintiff stated that she had used marijuana in the past (*see* Tr. 824).

22

23        For the stated reasons, the Court concludes that the ALJ's finding that plaintiff

24   made inconsistent statements is a finding based on substantial evidence in the record as a

1  whole. The Court also concludes that this finding supports the ALJ's failure to credit

2  fully plaintiff's allegations and testimony.

3        The Ninth Circuit has "recognized that harmless error principles apply in the

4  Social Security Act context." *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012)

5  (*citing Stout v. Commissioner*, *Social Security Administration*, 454 F.3d 1050, 1054 (9th

6  Cir. 2006) (collecting cases)). The court noted that "several of our cases have held that an

7  ALJ's error was harmless where the ALJ provided one or more invalid reasons for

8  disbelieving a claimant's testimony, but also provided valid reasons that were supported

9  by the record." *Id.* (citations omitted). The Ninth Circuit noted that "in each case we look

10 at the record as a whole to determine [if] the error alters the outcome of the case." *Id.* The

11 court also noted that the Ninth Circuit has "adhered to the general principle that an ALJ's

12 error is harmless where it is 'inconsequential to the ultimate nondisability

13 determination.'" *Id.* (*quoting Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F.3d 1155,

14 1162 (9th Cir. 2008)) (other citations omitted). The court noted the necessity to follow

15 the rule that courts must review cases "'without regard to errors' that do not affect the

16 parties' 'substantial rights.'" *Id.* at 1118 (*quoting Shinseki v. Sanders*, 556 U.S. 396, 407

17 (2009) (*quoting* 28 U.S.C. § 2111) (codification of the harmless error rule)).

18       The Court concludes that even if the ALJ committed an error in the evaluation of

19 plaintiff's credibility, any such error is harmless error. The ALJ included multiple

20 findings based on substantial evidence in the record that support his failure to credit fully

21 plaintiff's allegations and testimony. The Court concludes that the ALJ provided clear

22 and convincing reasons for his failure to credit fully plaintiff's credibility.

1

<u>CONCLUSION</u>

2

    Based on the stated reasons and the relevant record, the Court **ORDERS** that this

3

matter be **AFFIRMED** pursuant to sentence four of 42 U.S.C. § 405(g).

4

    **JUDGMENT** should be for defendant and the case should be closed.

5

Dated this 6th day of November, 2014.

6

7

8

J. Richard Creatura
United States Magistrate Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24